UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH VINCENT WARD,

Petitioner,

v.

SUZANNE M. PEERY,

Respondent.

No.  2:21-cv-2220 DAD KJN P

FINDINGS & RECOMMENDATIONS

I.  Introduction

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2018 conviction for second degree murder.  Petitioner claims that the jury's verdict finding petitioner competent to stand trial was not supported by substantial evidence.  After careful review of the record, the undersigned concludes that the petition should be denied.

II.  Procedural History

In the Nevada County Superior Court, a jury found petitioner competent to stand trial and later convicted petitioner of murder.  (ECF No. 11-1 at 1.)  On October 2, 2018, petitioner was sentenced to fifteen years to life in state prison.

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District.  The Court of Appeal affirmed the conviction on February 24, 2021.  (ECF No. 11-1.)

On April 7, 2021, the facts summary in the opinion was slightly modified, with no change to the judgment, and the petition for rehearing was denied.  (ECF No. 11-6.)

Petitioner filed a petition for review in the California Supreme Court, which was denied without comment on May 12, 2021.  (ECF Nos. 11-7, 11-8.)

The instant petition was filed on December 2, 2021.  (ECF No. 1.)

After this action was submitted, petitioner filed a motion for stay and abeyance under Rhines v. Weber, 544 U.S. 269, 276 (2005), to return to state court and exhaust seven new claims. The court recommended that the motion be denied, and because the unexhausted claims were untimely and did not relate back to petitioner's pending competency claim, recommended that a stay under Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003), also be denied.  (ECF No. 24.)  The findings and recommendations were adopted over petitioner's objections on July 27, 2023.  (ECF No. 26.)

Petitioner filed a motion for reconsideration, which was denied by the district court on August 23, 2023.  (ECF Nos. 27, 28.)

Petitioner filed an appeal; on October 26, 2023, the Court of Appeals for the Ninth Circuit dismissed the appeal for lack of jurisdiction.  (ECF Nos. 29, 33.)

III.  Notice of Related Cases

On December 22, 2023, respondent filed a notice of related cases, citing the federal habeas petition subsequently filed by petitioner on October 2, 2023.  Ward v. Campbell, No. 2:23-cv-2175 WBS DMC (E.D. Cal.).  By separate findings and recommendations recently issued therein, the undersigned declined to recommend having his second habeas petition construed as an amended petition and filed in the instant case because petitioner's putative claims are untimely and do not relate back to the sole competency claim pursued in this action.  Id. (ECF No. 19.)

IV.  Facts[1]

On direct appeal, the California Court of Appeal summarized the evidence presented at trial and other relevant facts, with the subsequent factual modification included, as follows:

---

[1]  The facts are taken from People v. Ward, No. C088158 (Feb. 24, 2021), a copy of which was lodged by respondent as Lodged Document #1 (ECF No. 11-1).

2

FACTUAL AND PROCEDURAL BACKGROUND

Few of the facts of defendant's underlying offense are relevant to the issue defendant asserts on appeal. In short, the victim and defendant were close, and the victim referred to defendant as his son, although they were not biologically related. Defendant stayed on the victim's property for several days with his girlfriend and his girlfriend's daughter; the girlfriend and her daughter left a day or two later. A number of other guests were also staying at the victim's property at the time. Around the time of defendant's arrival, the victim noticed that several lottery tickets he kept in the garage had gone missing.

The victim went missing one morning and defendant left the property soon after. That evening, one of the guests and the victim's neighbor searched the property and found the victim's body under a tarp in the garage. Defendant was later apprehended with a small bloodstain on one of his boots that matched the victim's DNA profile. A detective interviewed defendant's girlfriend, who said defendant had told her he killed the victim.

The prosecution charged defendant with murder and defense counsel declared a doubt as to defendant's competency to stand trial. The court proceeded to conduct a jury trial on the issue of competence.

*Defense Evidence*

Detectives Andrew Liller and Rhiannon King conducted two interviews with defendant at defendant's request.[FN1] In the interviews, defendant explained he smoked methamphetamine with the victim when he arrived at the victim's property. Later, while he was doing yard work, he found a bone in the victim's garden. He felt that something underneath the ground was pushing up against him and he felt scared. He theorized the victim had a "device to make people disappear" that emitted steam. He believed the victim's girlfriend was buried underground.

[FN1 Recordings of the interviews were admitted into evidence and played for the jury at trial.]

Defendant explained the victim worked for the government and had planted a "chip" in defendant.[FN2] He knew the victim had been dealing drugs and was in a secret society called the "book of names." He told the detectives he believed the victim was a serial killer and urged them to investigate further. He also mentioned the victim had kept two girls chained up in his lake house.

[FN2 Later investigation determined the victim had, in fact, been a confidential informant in a drug investigation in 2009.]

When the detectives asked defendant about his activities after the victim's murder, he declined to answer, saying "I don't wanna admit to doin' somethin'- -." He said he "didn't murder anybody . . . if you look up the definition of murder" and repeatedly reminded the detectives his life was "on the line." He promised to speak with the detectives again if they went out to the property because he wanted

3

to know if his thoughts were real. The first interview ended when defendant started crying.

In the second interview, defendant said he had talked to his lawyer and she was upset he had agreed to talk to the detectives. She had told him the detectives had sent cadaver-sniffing dogs out to the victim's property but had not found anything. Defendant explained that when he was on the victim's property, he felt something pushing up from beneath his feet and thought somebody was trapped underground. He thought the area under the garage was hollow.

Defendant expressed concern about going to prison, saying he could "get a life sentence" and "I can't see myself goin' to prison for this. I, I will kill myself in this jail." He urged the detectives to further investigate his claims, saying "I can't confess to you that I did this. Because right now, it just looks like that would make -- it sounds like I'm makin' all this up and I'm a murderer. Find the evidence and then I . . . . [¶] Go find the bodies."

Detective Liller attributed defendant's bizarre statements to drug use and observed defendant seemed to understand and respond appropriately to questions. In particular, the detective noted defendant carefully avoided talking about the details of the murder.

Correctional officers testified defendant had sometimes refused legal mail and visits from his attorney while in jail. On cross-examination, one officer acknowledged she had not observed any behavior from defendant she believed would qualify him as mentally ill, though she did not have any training in psychology.

Several phone calls defendant made to family members from jail were entered into evidence. In the first phone call, with his mother, defendant relayed a conversation he had had with his attorney involving the incriminating statement his girlfriend had made to investigators. He told his lawyer about the chip in his body and the victim's relationship to the government, but his lawyer had laughed at him. He drew a map for her to show where he had been on the victim's property. His attorney told him she wanted to delay the arraignment and waive the preliminary hearing. His mother urged him not to listen to his attorney.

In the next call, between defendant, his mother, and his sister, defendant complained his lawyer wanted to defer his plea because she wanted more time to investigate. He wanted to alert the media to his case, but his lawyer told him that was a bad idea. He also suspected his lawyer was attempting to lay the groundwork for an insanity plea because she asked him about whether he had ever had any head injuries. He was upset because "[t]hey're gonna make it look like I'm fuckin' crazy. They're gonna give me a life sentence."

Defendant told his mother he needed someone to go to the property and dig around to find bodies. He reiterated he did not trust his lawyer and wanted to fire her.

////

4

Defense counsel called Dr. Jason Roof, a forensic psychiatrist who was retained by the court to evaluate defendant. Dr. Roof reviewed witness statements associated with defendant's crime, jail telephone calls from defendant to his family members, and video of the detective interviews of defendant. Dr. Roof did not interview defendant or review any medical records and did not provide a diagnosis of defendant's mental health condition.

Rather, Dr. Roof explained defendant displayed a "delusional belief system" that could be explained by a diagnosis of schizophrenia or delusional disorder. He noted defendant's belief that the victim's property contained "bodies underneath the ground . . . perhaps dead but also alive and tethered underground" and defendant's belief in a government cover-up. He did not find any evidence to suggest defendant was malingering. Defendant interrupted Dr. Roof's testimony several times, saying it was "[b]ullshit" and a "cover up for the DEA." Defendant eventually asked for a *Marsden*[FN3] motion and asked to leave the courtroom. The court denied the motion, but allowed defendant to leave the courtroom.

[FN3 *People v. Marsden* (1970) 2 Cal.3d 118.]

Dr. Roof opined defendant was not able to assist counsel in a rational manner because of his "persistent distrust" of defense counsel and insistent focus on trying to get others to dig up the victim's property to look for dead bodies. He also concluded defendant's symptoms affected his ability to understand the nature of the charges because defendant viewed the delusions as more concerning than the charges or the case against him.

On cross-examination, Dr. Roof noted defendant had been using methamphetamine at the time of the crime and that the drug use, rather than a mental health condition, could have contributed to defendant's statements. He also admitted offering an opinion on an individual he had not examined was "a departure from established methods of examination" offered by the American Psychiatry Association.

Peter Kmeto, a criminal defense attorney, testified as an expert in the representation of criminal defendants. He explained visiting clients in jail helps establish a relationship with a client and is also a valuable way to gather information on the case. A defendant's refusal to meet with his or her attorney limits the defendant's ability to assist counsel and participate in a defense. A defendant's delusional beliefs could undermine his ability to assist counsel by causing him to focus exclusively on the delusion to the detriment of the defense. He explained defendant had failed to assist counsel and participate in his own defense by speaking to the detectives, refusing visits from his attorney, and accusing his attorney of lying to him.

On cross-examination, he acknowledged even mentally healthy defendants do not always make good legal decisions. Moreover, a defendant making statements like "my life's on the line" demonstrates an appropriate grasp of the gravity of his situation in a criminal case.

5

1

*Prosecution Evidence*

2
3
4
5
6
7

The prosecution called Dr. Kevin Dugan, a forensic psychologist, as an expert in trial competency in criminal law. Dr. Dugan was appointed to evaluate defendant, but defendant refused to meet with him. As a result, Dr. Dugan was not able to offer an opinion on the case. An interview, Dr. Dugan explained, is a "[c]ritical" step when evaluating a defendant's competence to stand trial. Dr. Dugan highlighted various assessments that could be performed in person to evaluate competency. Without a personal evaluation, it would be inappropriate to offer opinions about a defendant. In Dr. Dugan's opinion, a careful review of a defendant's medical history is also important.

8
9
10
11

Reviewing a police report is not an adequate substitute for personally evaluating a defendant because it shows only how a defendant was functioning at the time the report was created, not at the time of the competency evaluation. Law enforcement officer interviews with a defendant are similarly limited. Even reviewing jail phone calls in addition to police reports and interviews allows no more than "an educated guess" about a defendant's condition.

12
13
14
15

Collin Nelson, an investigator with the district attorney's office, testified he followed up on defendant's claim the victim had kidnapped two young women and kept them in his lake house. Nelson interviewed defendant's former girlfriend, who confirmed defendant's account, but he could not find any missing person reports corroborating the story and did not investigate further.

16
17
18

Correctional Officer Paul Jacobson testified he had regular contact with defendant while he was in jail. He did not observe any bizarre behavior that gave him concerns about defendant's mental health. Moreover, he had asked defendant about his mental health history for jail classification purposes and none of defendant's responses raised any concerns about his mental health.

19
20
21
22
23

The prosecution introduced a series of jail phone calls defendant had made to family members. In one call, defendant discussed his girlfriend's statement to police that he had admitted killing the victim to her. He said he was not guilty of murder because murder is the "unlawful killing" of another. He also expressed his concern about serving a prison term, saying: "I'd rather fuckin' say I planned on doin' it and get a needle or somethin', get put to sleep. I don't wanna spend the rest of my life in a fuckin' cell. I'm in a cell all the time, mom."

24
25
26

In another call, defendant talked with his family about a conversation they had with defense counsel. They argued with defense counsel about waiving time for trial and defendant questioned whether the time for his trial began running from the date of his plea. Defendant recounted his interview with the detectives and said he suspected they were trying to get him to confess to the murder.

27
28

In a third call, defendant told his mother about a conversation he had with defense counsel. Defendant said he was tired of going back and

forth to court, and defense counsel explained she had just declared a doubt as to his competence. He asked defense counsel about evidence the prosecution had against him, and the two discussed the possibility of claiming he had acted in self-defense. He also asked defense counsel what a possible prison sentence for manslaughter would look like.

In a separate call, defendant asked his mother to speak to his girlfriend because he suspected the "cops threatened her" to provide incriminating information. He told her she needed to speak to his girlfriend and tell her to "put in writing that they threatened you or you made that up" because otherwise defendant would "go to prison for the rest of [his] life."

In another call, defendant complained his trial should have happened already. He discussed a similar case he had seen in the news involving a defendant who murdered a man he thought was the anti-Christ. The defendant in the other case also thought he had been "chipped by the government." The defendant tried to argue "he was crazy," and defendant thought defense counsel was trying to use a similar argument in his case. Defendant also relayed a conversation he had with defense counsel about seeking a new judge for the case. Defendant did not want a new judge because he "didn't have a . . . [¶] problem with the judge."

In a later call, defendant said he had been observing "other people's trials that are in the same kind of category," and decided he would not be "trying [to] say I'm cuckoo or something." Defendant stated he had tried to use the detective interview to explain how the victim had scared him many times in the past, and it did not make sense that he would kill the victim only now. Defense counsel told him he "shot [himself] in the foot by talking to the cops."

In one call, defendant reported he had received discovery showing the prosecution had evidence of the victim's blood on his boots. He discussed a variety of ways the blood could have gotten on the boots. He claimed the victim's family was "paying people off to do this."

Throughout the calls, defendant expressed general dissatisfaction with defense counsel. Among other things, he suspected she was working against him and playing "stupid games" by asking him to submit to a psychological evaluation. He joked about being incompetent and said he would not go to court or talk to his lawyer because they were just "circus clowns" and he did not want to "play their games." He accused defense counsel of being in on the "corruption" and "collusion" that was going on in the case and was upset when defense counsel told him they were probably going to "lose at this trial."

The prosecution called defendant's ex-wife, who testified she did not believe defendant had a history of mental health problems, although she had not spoken to him after he had been arrested.

////

7

1    The jury found defendant was mentally competent to stand trial. A
     separate jury later found defendant guilty of murder.
2

3    (ECF No. 11-1, as modified by ECF No. 11-6.)

4    V.  Standards for a Writ of Habeas Corpus

5           An application for a writ of habeas corpus by a person in custody under a judgment of a

6    state court can be granted only for violations of the Constitution or laws or treaties of the United

7    States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation

8    or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire,

9    502 U.S. 62, 67-68 (1991).

10          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

11   corpus relief:

12          An application for a writ of habeas corpus on behalf of a person in
            custody pursuant to the judgment of a State court shall not be granted
13          with respect to any claim that was adjudicated on the merits in State
            court proceedings unless the adjudication of the claim -
14
15          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
            determined by the Supreme Court of the United States; or
16
17          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
            State court proceeding.
18

19   28 U.S.C. § 2254(d).

20          For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of

21   holdings of the Supreme Court at the time of the last reasoned state court decision.  Thompson v.

22   Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45

23   (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S.

24   362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly

25   established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859

26   (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may

27   not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

28   specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S.

8

58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id.  Further, where courts of appeals have diverged in their treatment of an issue, there is no "clearly established federal law" governing that issue.  See Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413; see also Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  Id. at 103.

---

[2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1        The court looks to the last reasoned state court decision as the basis for the state court

2    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

3    Petitioner bears the "burden to demonstrate that 'there was no reasonable basis for the state court

4    to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S.

5    at 98).

6    VI.  Insufficient Evidence of Competence Claim

7        A.  The Parties' Arguments

8        The Petition

9        Petitioner does not set forth claims with supporting federal authority in his petition.

10   Rather, petitioner incorporates appellate counsel's arguments presented in the petition for review

11   and appellant's opening brief, both filed in the California Supreme Court.  In the petition for

12   review, he argued that there was a conflict between People v. Mendoza (2016) 62 Cal.4th 856, the

13   case relied upon by the state appellate court, and In re R.V. (2015) 61 Cal. 4th 181.  (ECF No. 1

14   at 11-14.)  Petitioner maintained that the state appellate court erred because it did not evaluate

15   whether the verdict of competency was supported by evidence that is reasonable, credible, and of

16   solid value, and whether the weight and character of such evidence of incompetence was such

17   that the factfinder could not reasonably have rejected it.  (ECF No. 1 at 12.)  Petitioner contended

18   that the state high court should reexamine and clarify the standard of review in the case because

19   in light of his "longstanding and persistent belief that there were human bodies under the ground

20   at [the victim's] property, some of which were attempting to get to the surface, but could not

21   because they had been tied to stakes; and that there was a machine under the ground that emitted

22   a plume of pressurized steam, and that could make people disappear," the jury would likely have

23   reached a different conclusion had the standards identified in In re R.V. been applied.

24        Further, petitioner argued that the state appellate court mentioned neither criteria, simply

25   claiming that the standard of review is a "deferential substantial evidence" standard which must

26   be viewed "in the light most favorable to the verdict."  (ECF No. 1 at 12, citing Op'n at 10.)

27   Review was needed because although the appellate court's statement of the standard of review

28   ////

1    was supported by People v. Mendoza, 62 Cal. 4th 856, it appeared inconsistent with the standard

2    applied in In re R.V., 61 Cal. 4th 181.

3        In his opening brief, petitioner contended there was not substantial evidence to

4    demonstrate petitioner was competent to stand trial, contending that the "criminal trial of an

5    incompetent defendant violates due process." (ECF No. 1 at 96, citing Cooper v. Oklahoma, 517

6    U.S. 348, 354 (1996)). Specifically, petitioner argued that:

> Contrary to the jury's verdict, the evidence in this case proves by a
> preponderance of the evidence that [petitioner] was not competent to
> stand trial because due to his fixed delusional beliefs, he was not able
> to rationally assist his attorney in his defense. This is so because of
> his persistent belief that Mr. Pestana had buried people alive in his
> garden and had secured them to stakes so that they could not escape
> to the surface, although their struggles to do so made the ground
> bulge under [petitioner's] feet; his belief that Mr. Pestana had a
> machine on the property that could make bodies disappear, and his
> belief that there was a connection between that machine and a large
> plume of pressurized steam that he had once observed coming out of
> the ground; his belief that Mr. Pestana had had an electronic chip
> implanted in his head, and that Mr. Pestana also had one in his own
> head (2 RT 341, 342); and his belief that Mr. Pestana had a house in
> Tahoe where there were dead women chained up. (2 RT 343.)

15    (ECF No. 1 at 99.) Because petitioner was so focused on such fixed delusional beliefs and his

16    efforts to get others to believe him, petitioner was unable to assist his lawyer in developing a

17    defense based on the real evidence and the law, and he was prevented from following counsel's

18    advice not to talk to sheriff's deputies or detectives, and such focus caused him to reject counsel's

19    advice and representation completely. (ECF No. 1 at 100-02.) Petitioner also argued that the

20    testimony of Dr. Roof and Peter Kmeto supports the conclusion petitioner was unable to assist his

21    attorney in preparing his defense, as did petitioner's telephone calls from the jail. (ECF No. 1 at

22    103-05.)

23        The Answer

24        Respondent counters that petitioner's arguments that the evidence of incompetence

25    outweighed the evidence of competence are solely based on state law and therefore unavailing.

26    Petitioner concluded that the evidence of incompetence was of such "weight and character" that a

27    reasonable jury would not have rejected it, but respondent contends that the evidence of

28    petitioner's competence was substantial, as the state appellate court found. Respondent argues

1   that it is impossible for petitioner to show on federal habeas that the state court's evidentiary

2   analysis was objectively unreasonable because there was no clearly established Supreme Court

3   authority that the state appellate court was required to apply.

4          Despite such requirement, petitioner failed to show in state court that the Constitution

5   provides for and protects "evidence-sufficiency requirements allowing a reassessment of the

6   evidence supporting a factfinder's determination that a criminal defendant failed to carry his

7   burden of proof."  (ECF No. 10 at 13.)  Further, respondent points out that petitioner failed to

8   demonstrate that the Supreme Court recognized that constitutional right in the context of such

9   competency determinations and set forth a framework to show petitioner is entitled to relief if the

10   factfinder was not provided sufficient evidence.  Respondent notes that even the closely

11   analogous case Cavazos v. Smith, 565 U.S. 1, 8 n.* (2011), demonstrates that the core of

12   petitioner's claim is contradicted by clearly established precedent.  (ECF No. 10 at 13 n.3.)  In

13   reviewing a claim alleging insufficient evidence to support a guilty verdict, the court stated:  "The

14   dissent's review of the evidence presented to the jury over seven days is precisely the sort of

15   reweighing of facts that is precluded by Jackson v. Virginia, 443 U.S. 307, 324 . . . (1979)."

16   Cavazos, 565 U.S. at 8 n.*.

17          Finally, respondent argues that the trial court safeguarded petitioner's Constitutional rights

18   by holding a hearing on the issue of petitioner's competence and instructing the jury on

19   "constitutionally acceptable presumptions and burdens of proof," and the jury found petitioner

20   competent to stand trial.  (ECF No. 10 at 13.)  The state appellate court's analysis of the evidence

21   of the jury's finding was reasonable on its face, but petitioner cannot prove otherwise on federal

22   habeas review without providing Supreme Court authority to the contrary.

23          The Reply

24          On November 30, 2023, petitioner was granted additional time to file a reply.  Petitioner

25   did not file a reply.  Rather, on December 18, 2023, petitioner filed a document styled, "Judicial

26   Notice," in which petitioner reiterates his efforts to obtain a stay to return to state court to exhaust

27   his ineffective assistance of counsel claims.  (ECF No. 35.)

28   ////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    B. Last State Court Opinion

        The last reasoned rejection of petitioner's claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> Defendant argues the jury's competence finding is not supported by substantial evidence. Specifically, defendant asserts "he was so wrapped up in" his delusional beliefs that "he was not able to assist his lawyer in developing a defense based on the law and the real evidence in the case." Defendant proceeds to catalog the evidence supporting a finding he lacked competency to stand trial. We do not agree the jury had insufficient evidence to find defendant competent.

> "The United States Supreme Court has 'repeatedly and consistently recognized that "the criminal trial of an incompetent defendant violates due process." ' [Citation.] A defendant is deemed incompetent to stand trial if he lacks ' " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him.' " ' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 690.)

> "The applicable state statutes essentially parallel the state and federal constitutional directives." (*People v. Lightsey, supra*, 54 Cal.4th at p. 691.) Penal Code [FN4] section 1367, subdivision (a) provides: "A person shall not be tried or adjudged to punishment . . . while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." There is a presumption of competence to stand trial, and the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence. (§ 1369, subd. (f); see *Medina v. California* (1992) 505 U.S. 437, 446 [120 L.Ed.2d 353, 363-364] [this burden of proof does not offend federal constitutional principles]; *People v. Mendoza* (2016) 62 Cal.4th 856, 871.)

> [FN4 Undesignated statutory references are to the Penal Code.]

> "We apply a deferential substantial evidence standard of review on appeal. 'In reviewing a jury's determination that a defendant is competent to proceed to trial, we give due deference to the trier of fact, and therefore view the record in the light most favorable to the verdict.' [Citations.] When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial." (*People v. Mendoza, supra*, 62 Cal.4th at pp. 871-872.)

13

Here, defendant understood the nature and potential consequences of the criminal proceedings against him. Both in the interview with Detectives Liller and King and in his phone calls, defendant frequently stated that his "life is on the line" and worried he might serve a life sentence if convicted. Peter Kmeto, the defense expert, agreed on cross examination that such statements were indicative of a defendant who "very much understood the gravity or the seriousness of the charges [he] w[as] facing." And on more than one occasion, defendant attempted to parse the legal definition of murder to explain he had never engaged in any "unlawful" killings, demonstrating he understood the charges in his case.

Defendant expressed a basic understanding of criminal procedure as well, discussing, at various points, the rules involved in waiving time for trial, waiving a preliminary hearing, and the timeline involved for both. Defendant understood defense counsel had declared a doubt as to his competence to stand trial and understood the court would be sending experts to examine him to evaluate his competence. He understood the evaluation process and its place in the context of the criminal proceedings well enough to compare his case to a different criminal case he read about in the newspaper, which involved a defendant with similar delusions. Defendant also had the insight to recognize defense counsel was pursuing a similar competency argument in his case. Similarly, defendant said he had been "watching other people's trials" as they proceeded through competency evaluations and did not want to meet with any doctors because he had seen the results in those cases.

Defendant also had the ability to assist counsel in his defense. Defendant did not always agree to meet with his attorney, but he did have several substantive conversations with defense counsel about legal strategy and was able to recount those conversations in detail. In one of the first phone calls introduced into evidence, for example, he recounted a meeting with his attorney in which they discussed evidence that had been produced in discovery and the possibility of waiving time and/or a preliminary hearing. Defendant explained he met with defense counsel "for four hours . . . and it seemed like . . . 45 minutes." In subsequent calls, he would frequently describe meeting with his attorney to discuss similar strategic matters, including the timing of entering a plea, whether they should involve the media in his case, whether to pursue a self-defense theory in the case, and whether to seek judicial recusal. He asked defense counsel about potential sentences and was chided by defense counsel when he spoke with investigators. Even when defendant was talking about trying to hire a new attorney, he was still meeting with and speaking to defense counsel.

Moreover, defendant frequently discussed the state of evidence in his case and understood the impact of that evidence. For example, defendant's girlfriend told investigators defendant had confessed to her. In a later call, defendant sought information about the girlfriend, who was a person of interest to investigators because investigators believed she or defendant had stolen lottery tickets from the victim shortly before his death. Defendant then tried to get his mother to speak to the girlfriend to get her to retract a statement she had made

14

to investigators. He realized such a retraction could cause her legal trouble, but said "if you get charged a misdemeanor for it big whoop-di-fucking-do. If you get a probation for it, big whoop-di-do." Likewise, when he received evidence that the victim's blood had been found on one of his boots, he began hypothesizing how to explain the blood.

When defendant spoke with the detectives, he similarly recognized the impact a confession would have, telling them "I can't confess to you that I did this. Because right now, it just looks like that would make--it sounds like I'm makin' all this up and I'm a murderer." In later calls, he voiced concern about his statements to the detectives, saying he thought they were only trying to get him to confess. He later explained his intent in the interview was to demonstrate he had known the victim for 20 years and had not killed him, even though the victim had scared him many times, so it would not make sense to kill him now "when he's an old man." All of these statements indicate defendant had an ample understanding of the facts and evidence in his case and could express that understanding to others if he chose to do so.

Defendant claims his persistent obsession with his delusions undermined his defense such that it prevented him from working with defense counsel and damaged the attorney-client relationship. The conflict between defendant and defense counsel about defendant's delusions, however, arose in one of defendant's first meetings with his attorney, when defense counsel did not believe his theory that the victim had implanted a microchip in his body. Despite this disagreement, he continued to meet with his attorney and received advice from her on several different strategic issues, as explained above. Even shortly before the competency trial, defendant met with his attorney for over two hours. And although defendant ignored his attorney's advice not to speak with investigators, the impact of that decision in the competency trial was diminished by the defense expert's admission that even mentally healthy defendants can make poor legal decisions. While defendant stated he distrusted his attorney and sometimes made decisions that ignored defense counsel's advice, "an uncooperative attitude is not, in and of itself, substantial evidence of incompetence." (*People v. Mai* (2013) 57 Cal.4th 986, 1034.) We conclude the jury's finding defendant was competent to stand trial is supported by substantial evidence.

(People v. Ward, slip op. at 9-14) (ECF No. 11-1 at 9-14).

## C.  Relevant Standards

A criminal defendant may not be tried unless he is competent.  Godinez v. Moran, 509 U.S. 389, 396 (1993); Sully v. Ayers, 725 F.3d 1057, 1070 (9th Cir. 2013).  The conviction of a defendant while legally incompetent violates due process.  Cacoperdo v. Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994).  The test for competence to stand trial is whether the defendant demonstrates the ability "to consult with his lawyer with a reasonable degree of rational

15

1 understanding" and a "rational as well as factual understanding of the proceedings against him."

2 Godinez, 509 U.S. at 396; Sully, 725 F.3d at 1070.  The question "is not whether mental illness

3 substantially affects a decision, but whether a mental disease, disorder or defect substantially

4 affects the prisoner's capacity to appreciate his options and make a rational choice."  Dennis v.

5 Budge, 378 F.3d 880, 890 (9th Cir. 2004).  "A 'rational choice' does not mean a sensible

6 decision."  Id.  A state court's finding of competency to stand trial is presumed correct if fairly

7 supported by the record.  Deere v. Cullen, 718 F.3d 1124, 1145 (9th Cir. 2013).  No formal

8 evidentiary hearing is required for the presumption to apply.  Id.  A habeas petitioner must come

9 forward with clear and convincing evidence to rebut the presumption.  Id.  These rights derive

10 from the Fourteenth Amendment's guarantee of due process.  See Ryan v. Gonzales, 568 U.S. 57,

11 65 (2013).

12         A state court's finding that a defendant was competent to stand trial is entitled to

13 deference under AEDPA § 2254(d).  See Demosthenes v. Baal, 495 U.S. 731, 735 (1990) ("A

14 state court's determinations on the merits of a factual issue are entitled to a presumption of

15 correctness on federal habeas review. . . .  [A] state court's conclusion regarding a defendant's

16 competency is entitled to such a presumption."); Davis v. Woodward, 384 F.3d 628, 644 (9th Cir.

17 2004); Rosemond v. Beard, 2015 WL 7458728 at *6 (E.D. Cal. Nov. 24, 2015).  The federal

18 habeas court "may consider only the evidence that was before the trial judge," Davis, 384 F.3d at

19 645, and "may not second-guess a state court's fact-finding process unless, after review of the

20 state-court record, it determines that the state court was not merely wrong, but actually

21 unreasonable."  Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004), overruled on other grounds

22 by Cullen v. Pinholster, 563 U.S. 170, 185 (2011).

23                 D.  Analysis

24         Initially, to the extent petitioner contends the state court applied the wrong state law

25 standard in evaluating his competence, such claim is unavailing.  It is only noncompliance with

26 federal law that renders a state's criminal judgment susceptible to collateral attack in the federal

27 courts.  28 U.S.C. § 2254(a); Estelle, 502 U.S. at 67-68 ("[I]t is not the province of a federal

28 habeas court to reexamine state-court determinations on state-law questions.")

1    Moreover, as argued by respondent, while the Supreme Court has found that certain

2    procedures states have taken to protect a defendant's right not to be tried while incompetent are

3    constitutionally adequate, little Supreme Court authority clearly establishes what procedures are

4    required by the U.S. Constitution.  See Drope v. Missouri, 420 U.S. 162, 172-73 (1975) (the

5    Court has not "prescribe[d] a general standard with respect to the nature or quantum of evidence

6    necessary to require resort to an adequate procedure."); Medina v. California, 505 U.S. 437, 453

7    (1992) ("'traditionally, due process has required that only the most basic procedural safeguards be

8    observed; more subtle balancing of society's interests against those of the accused has been left to

9    the legislative branch.'") (quoting Patterson v. New York, 432 U.S. 197, 210 (1977)).  When

10   circumstances so dictate, trial courts may safeguard a criminal defendant's basic procedural due

11   process rights by holding a hearing during which the defendant is presumed competent to stand

12   trial, and the defendant must show by a preponderance of evidence that he is not competent to

13   stand trial.  Medina, 505 U.S. at 453.  Here, neither party identifies a Supreme Court case

14   establishing a framework to review the sufficiency of the evidence of such competency

15   determination, and this court has not found one.

16   That said, petitioner's Constitutional rights were protected by having the jury decide

17   whether or not petitioner was competent to stand trial.  The record demonstrates that petitioner

18   was present, represented by counsel, and permitted the opportunity to adduce evidence

19   concerning his alleged lack of competency.  See, e.g., Clerk's Transcript Vol. II ("CT II") at 210-

20   12 (ECF No. 11-10), 216-18; 220-21; 223-25; 227-29); Reporter's Transcript Vol. II at 326 to

21   550 (ECF No. 11-13 at 72-205) to Vol III at 551-729 (ECF No. 11-14 at 23-197).  Such record

22   reflects petitioner was provided basic procedural due process in connection with the competency

23   trial, and the trial judge appropriately instructed the jury as to presumptions and burdens of proof.

24   Id. & CT II at 248 (ECF No. 11-10 at 53).

25   Further, as set forth above, state court competency determinations are entitled to a

26   presumption of correctness.  See Brewer v. Lewis, 989 F.2d 1021, 1027 (9th Cir. 1993) (citing

27   Demosthenes v. Baal, 495 U.S. at 735).  A federal court may overturn a state court competency

28   finding only if it is not fairly supported by the record.  See id.  Here, the state court competency

finding is fairly supported by the record.  As found by the state appellate court, there was

evidence that petitioner understood the nature and potential consequences of the criminal charges,

understood the basics of criminal procedure, and was able to assist counsel in petitioner's defense

on several occasions, despite not always agreeing to meet with counsel.  Evidence also showed

that petitioner understood the impact of certain evidence in his case, including his alleged

confession to his girlfriend, and the drop of the victim's blood on his boot.  Although the record

reflects conflicting evidence concerning petitioner's competence to stand trial and rational minds

might disagree about such evidence, the undersigned cannot find on this record that the state

court's decision that petitioner was competent was based on an unreasonable determination of the

facts or that such decision is contradicted by clear and convincing evidence.

Therefore, the undersigned finds that the appellate court's decision is not contrary to or an

unreasonable application of any Supreme Court precedent and was not based upon an

unreasonable determination of the facts.

VII.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

he shall also address whether a certificate of appealability should issue and, if so, why and as to

which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

§ 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

/////

/////

/////

18

1  service of the objections.  The parties are advised that failure to file objections within the

2  specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

3  F.2d 1153 (9th Cir. 1991).

4  Dated:  March 19, 2024

5

6  CAROLYN K. DELANEY
   UNITED STATES MAGISTRATE JUDGE

7  /ward2220.157

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19